UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS

FILED
2013 JUN 11 AM 8:09

------------------------------------------------------------X
BLAZING KAT PRODUCTIONS, LLC, KATHERINE
R. McCONAGHIE, and NADER MOKHTARI,

        Plaintiffs,

    – against –

ISLAMIC REPUBLIC BROADCASTING d/b/a PRESS
TV, and AMIR TAJIK, in his individual and corporate
capacities,

        Defendants.
------------------------------------------------------------X

**COMPLAINT & JURY DEMAND**

Civil Action No.

EP13CV0190

In this diversity action for breach of an express contract(s) and/or implicit contract(s), and for negligent infliction of emotional distress, plaintiffs hereby allege against the defendants as follows:

## I. THE PARTIES, PERSONAL & SUBJECT MATTER JURISDICTION & VENUE

1.    Plaintiff BLAZING KAT PRODUCTIONS, LLC ("BKP") is Limited Liability Company created and formed under the laws of the State of Texas and/or the United States. BKP's address is 312 Coral Hills Road, El Paso, County of El Paso County (the "Principle Location").

2.    At all relevant times, BKP is an international video production company, with studio production and camera crews in the U.S., and makes documentaries and other types of video productions.

3. At all relevant times, plaintiff Katherine R. McConaghie ("McCONAGHIE") was and continues to be one (1) of two (2) Managing Members of BKP. As such, McCONAGHIE was authorized and continues to be authorized to enter into and execute contracts on behalf of BKP, such as the express and/or implicit contracts at issue in this case.

4. At all relevant times, plaintiff Nader Mokhari ("MOKHTARI") was and continues to be the 2nd Managing Member of BKP. As such, MOKHARI was also authorized and continues to be authorized to enter into and execute contracts on behalf of BKP, such as the express and/or implicit contracts at issue in this case.

5. Defendant Islamic Republic of Iran Broadcasting (or "IRIB") d/b/a PRESS TV (or "PTV"), is a 24-hour English language news foreign network owned by the Iranian state media corporation. Upon information and belief, IRIB's and/or PTV's headquarters and/or principle place of business are/is located at 6, East 2nd Street, 24- Metri Blvd., Sa'adat abad, Tehran 1997766411, I.R. IRAN (or "PTV's Principle Place of Business").

6. To establish the Court's personal jurisdiction over IRIB and PTV, there was and continues to be: substantial interrelation of operations between IRIB and PTV; centralized control of PTV by the IRIB; common management between IRIB and PTV; common ownership and control between IRIB and PTV (collectively referred herein as the "Company" or "PTV"),

7. At all relevant times, defendant Amir Tajik ("TAJIK"), an Iranian national, was and continues to be PTV's Production Manager for PTV's Documentary Department, and had authority and continues to have the authority to enter into contracts on behalf of the PTV, such as those that are at issue in this case.

8. Plaintiffs BKP and McCONAGHIE are residents/ citizens of the State of Texas; PTV and/or the Company, with its principal place of business in Tehran, I.R. IRAN, and plaintiff MOKHTARI are citizens of I.R. IRAN.

9. In this case, the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and thus, this Court has diversity jurisdiction over this action pursuant to 28 USC sec. 1332. Also, this Court has "federal question" jurisdiction and "personal" jurisdiction" over plaintiff PTV's claims under the Foreign Sovereign Immunities Act (or "FSIA") and is invoked under 28 USC secs. 1330(a) and 1330(b).

10. The jurisdiction of this Court over plaintiffs' state tort claims under the common law of the state of Texas is invoked pursuant to 28 USC sec. 1367(a) since plaintiff's federal and Texas state claims all "stem from the same nucleus of operative facts."

11. PTV, or the Company, are not immune from suit since BKP's claims for breach of express and/or implied contracts are based on the I.R. IRAN's and/or the Company's commercial activity in the United States, "either through [the Company's] regular course of commercial conduct or a particular commercial transaction or act" in Texas and/or the United States in general, which had and continues to have "substantial contact" with the United States. See, 28 USC sec. 1605(a)(2).

12. Venue is proper in this judicial district since all defendants' unlawful practices alleged herein, and/or the adverse effects from these unlawful practices negatively affecting all plaintiffs, were committed and/or occurred in this judicial district pursuant to 28 USC sec.1391.

## II. FACTUAL AVERMENTS.

### AS & FOR PLAINTIFFS' CLAIMS AGAINST DEFENDANTS FOR BREACH OF AN EXPRESS CONTRACT RELATED TO THE "99ers" DOCUMENTARY

13. On or about March 6, 2012, BKP entered into a valid written contract (attached hereto as Exhibit "A" is a copy of the 03/6/12 Contract, or "CONTRACT NO. 1") with PTV, or the Company, through TAJIK.

14. Pursuant to the CONTRACT NO. 1, BKP provided services to PTV, or the Company, for the "production of audio-visual works [called the "99ers Documentary" or the "Documentary Series"), of the social and political genre in [English to be broadcast] on television."

15. Pursuant to CONTRACT NO. 1, PTV, or the Company, agreed to pay BKP a sum total of $72,000.00, based on BKP's delivery of the terms and schedule specified in Sec. 3 of said 1st CONTRACT, as well as per other terms and conditions stated in CONTRACT NO. 1.

16. At all relevant times herein, BKP fully delivered and complied with each and every term and condition of CONTRACT NO. 1.

17. In or about June 2012, PTV, or the Company, and TAJIK first breached CONTRACT NO. 1, at no fault of BKP as BKP had fully complied, at all relevant times herein, with all terms and conditions of CONTRACT NO. 1, by failing to pay the 1st installment, and other installments due and owing, of the sum total.

18. PTV, or the Company, and TAJIK had no basis, in fact or in law, to breach CONTRACT NO. 1 since BKP had complied with each and every term of CONTRACT NO. 1.

19.     In fact, PTV, or the Company, and TAJIK breached CONTRACT NO. 1 several times without any basis, in fact or in law, by failing to pay the full installments as per the CONTRACT NO. 1's schedule, terms and conditions.

20.     BKP sent PTV, or the Company, (and TAJIK) several notices that PTV had materially breached CONTRACT NO. 1, to no avail.

21.     As a result, BKP was not paid several thousands of dollars by PTV, or the Company, nor by TAJIK without any justification in fact or in law, defendants have materially breached CONTRACT NO. 1, which has resulted in monetary losses, as well as consequential damages, to all the plaintiffs.

### AS & FOR PLAINTIFFS' CLAIMS AGAINST DEFENDANTS FOR BREACH OF AN EXPRESS AND/OR IMPLIED CONTRACT RELATED TO THE "OWS WEEK" PROGRAM SERIES

22.     On or about December, 2011, BKP entered into a valid express and/or implied contract (the "OWS CONTRACT") with PTV, or the Company, in which BKP would deliver audio/ video episodes of "OWS Week" to PTV, or the Company, and similar to CONTRACT NO. 1., PTV would be required to make payment to BKP after invoices were issued by BKP after it delivered episodes of OWS Week to PTV, or the Company.

23.     Indeed, at all, most or certain times, PTV, or the Company, would make payment to BKP by making wire transfers of partial payments to BKP's corporate/ business account for the OWS CONTRACT.

24. Similar to CONTRACT NO. 1, at all relevant times herein, BKP complied with all the material terms of the express and/or implied OWS CONTRACT, and was entitled to full payments for delivering episodes of OWS Week to PTV, or the Company.

25. Without any basis and/or justification, in law or in fact, PTV, or the Company, and TAJIK would withhold monetary sums owed to BKP despite BKP's delivery of episodes of OWS Week to PTV, or the Company.

26. Similar to CONTRACT NO. 1., BKP sent PTV, or the Company, several notices that PTV had materially breached the express and/or implied OWS CONTRACT, to no avail.

27. As a result, BKP was not paid several thousands of dollars by PTV, or the Company, nor by TAJIK without any justification in fact or in law, all defendants have materially breached the OWS CONTRACT, which has resulted in monetary losses, as well as consequential damages, to all the plaintiffs.

28. Lastly, as a result of all defendants' breach of both CONTRACT NO. 1 and the OWS CONTRACT, plaintiffs McCONAGHIE and MOKHTARI have suffered serious and significant mental anguish, which is compensable.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiffs pray that this Court empanel a jury of plaintiffs' peers, and enter judgment against defendants as follows, in an amount, at a minimum, of $250,000.00, to be determined at trial, inclusive of statutory interest, and:

(a) an award of full monetary and consequential damages to all plaintiffs, and damages to the individual plaintiffs for mental anguish caused by defendants' breach of CONTRACT NO. 1;

(b) an order by this Court to PTV to cease and desist any attempt to cash or redeem a Bank Melli Iran check written on Nader Mokhtari's personal account at Bank Melli Iran Lavassan branch in the amount of IR rials 1,420,000,000 (USD 109,230.77 at the official rate of exchange) and bonds written to the same value.

(c) an award of full monetary and consequential damages to all defendants, and damages to the individual plaintiffs for mental anguish caused by defendants' breach of the OWS CONTRACT;

(d) an award of plaintiff's reasonable attorney's fees and the costs incurred for prosecuting this action; *and*

(e) any such other and further relief as this Court may seem just and proper.

Dated: June 4, 2013
      El Paso, Texas

                                        Respectfully Submitted,

*/s/ Katherine McConaghie Pro Se*
Katherine McConaghie, as
Managing Director of plaintiff
Blazing Kat Productions, LLC, and
On behalf of plaintiff Nader Mokhtari,
Managing Director of plaintiff
Blazing Kat Productions, LLC
312 Coral Hills Road,
El Paso, County of El Paso County
Texas 79912

# Producer Agreement

This AGREEMENT made as of this ...03...... day of ......JUNE................... 2012
(the "**Commencement Date**")

between

**PRESS TV Documentary Department** of no. 6, East 2nd St. 24-Metri Blvd., Sa'adat abad Tehran 1997766411   I.R.Iran ("**Press TV**")

and

**Nader Kian Mokhtari** of

..................................................................................................................................

(the "**Contractor**")

regarding the services of the Contractor for the production of audio-visual works, of the social and political genre in the English language, capable of broadcasting on television entitled

## 99ers
(the "**Documentary**")

### The Schedule

**Duration of the Documentary:**     12 x 25 minutes

**Due Delivery Date:**     Seven Months after signing the contract

**The Sum (in words and figures):**     $ 72,000 or Seventy-two Thousand Dollars
(in accordance with clause 3 of the Agreement)

**Bank account details**

Payee:            ..................................................................................................

Bank:             ..................................................................................................

Other info:       ..................................................................................................

                  ..................................................................................................

**Signatures:**    _[signature] Press TV Documentary_          _[signature] Nader Kian Mokhtari_

1

1. **Definitions**

    ### Actual Delivery Date

    The date on which Delivery actually takes place.

    ### Archive

    Material previously recorded by the Contractor and other audio-visual material stored by Press TV.

    ### Delivery

    The physical delivery of the Final Production by the Contractor to Press TV evidenced by a confirmation of receipt email from Press TV to the Contractor.

    ### Due Delivery Date

    The date on which Delivery must take place as stated in the Schedule.

    ### Final Production

    The completed audio-visual works as the Documentary, a film, produced by Nader Kian Mokhtari, directed by Nader Kian Mokhtari, filmed in the US, with stereo sound and HD format, 20% being archive footage, 80% being original production, on Digital Betacam tapes, which fully complies with the relevant provisions of this Agreement and the proposal sent to Press TV Documentary Department. The Final Production also includes a clean international version of the Documentary without transcripts, narrations, subtitles, captions, Astons, opening credits or ending credits. The Final Production includes the following components:

    - Audio Track 1: Presenter/Dialogues (in original recorded language), Sound Effects/Ambience;
    - Audio Track 2: Music;
    - Word file for complete Documentary transcript;
    - WAV file for all voiceovers and narrations;
    - Music Cue Sheet
    - Program As Completed Form (attached to this Agreement)

    ### Late Delivery Fee

    The fee payable by the Contractor to Press TV for delivering the Final Production later than the Due Delivery Date. The amount payable is calculated on the Pro-rata basis stated in the relevant provisions of Clause 3 of this Agreement and the days calculated are the number of clear calendar days between the Due Delivery Date and the Actual Delivery Date.

2



**Rough Cut**

The collection of unedited footage and other audio-visual works produced by the Contractor for the Documentary to be reviewed by the Company prior to the Final Production.

**Rushes**

Original and unedited audiovisual material recorded by the Contractor for the purposes of producing the Documentary. That means all the Recorded rushes (including the footage not used in the final cut) should be delivered by the contractor after Press TV's final approval.

2. **Services**

a) In the production of the Documentary, the Contractor shall provide the services expected of a world-class producer of audio-visual works, which conform to the technical standards, requirements and guidelines of Press TV and the Schedule.

b) Notwithstanding the above, the Documentary shall also comply with the Technical Programme Specifications as stated in the attached booklet entitled "Technical Standards for Programme Delivery", which is the copyright of Press TV.

c) The technical and editorial format of the Documentary shall comply with the proposal that the Contractor submitted to Press TV's Documentary Department.

d) The Contractor shall deliver to Press TV the Rough Cut and two trailers, being between thirty and sixty seconds long, no later than six weeks prior to the Due Delivery Date. Within seven working days of receipt, Press TV shall provide a written response to the Contractor either approving the Rough Cut as being a good template for the Final Production; or providing guidance to the Contractor on how to use the Rough Cut to render the Documentary to an acceptable standard; or to absolutely reject the Rough Cut.

e) The Contractor shall produce and deliver the Final Production to Press TV no later than the Due Delivery Date. Late production and delivery of the Final Production shall give the absolute right for Press TV to reject the Final Production and no further payment shall be due to the Contractor, unless an acceptable reason is communicated in writing to Press TV within five clear calendar days of the Due Delivery Date. If Press TV accepts and approves late delivery of the Final Production, the Contractor shall be liable to Press TV for a Late Delivery Fee in accordance with Clause 3 of this Agreement. If Press TV rejects late delivery of the Final Production, the Contractor shall be liable to Press TV for damages to the full extent permitted by law.

f) Upon receipt of the Final Production, Press TV shall submit to Press TV the Final Production for approval. Press TV shall write to the Contractor within twenty-one working days of the Actual Delivery Date to either approve the Final Production;

3



or to provide guidance to the Contractor on how to improve the Final Production; or to absolutely reject the Final Production.

g) Press TV reserves the absolute right to reject the Final Production after viewing if, in the reasonable opinion of Press TV, it does not conform to the technical standards, requirements or guidelines of Press TV or the Schedule.

h) Notwithstanding anything to the contrary contained herein, Press TV shall have no obligation to actually distribute or otherwise exploit the Documentary or the services that the Contractor may render hereunder. Subject to all the provisions hereof, Press TV's only obligation hereunder is to pay to the Contractor the Sum specified in the Schedule, subject to the terms of this Agreement.

i) The Contractor shall submit the Rushes to the Company not earlier than the date of payment of the Sum in accordance with Clause 3 (a) (iv) of this Agreement.

3. **Payment**

a) In consideration for the Services referred to in clause 2 of this Agreement, Press TV shall pay to the Contractor only the Sum stated in the Schedule for the Final Production, upon receipt of valid invoices, as follows:

   i) 25% of the Sum upon the date of the mutual signature of this Agreement; Moreover $10,000 will be paid for equipment costs and all the equipment must be delivered to Documentary Department.

   ii) 25% of the Sum payable upon the Delivery of the Rough Cut and Approval of the Trailers.

   iii) 25% of the Sum upon the Delivery of the Programs.

   iv) 25% of the Sum payable within twenty-one working days of the Actual Delivery Date and Press TV's written approval of the Final Production.

b) The Sum stated in the Schedule shall constitute complete remuneration for the Services.

c) Press TV shall not be liable for any costs or travel expenses incurred by the Contractor.

d) The Pro-rata rate for the purpose of this Agreement shall be calculated on the basis of 6.5% APR of the total Sum stated in the Schedule to this Agreement.

4. **Intellectual Property**

a) For all the work produced by the Contractor for Press TV, the Contractor will be accorded appropriate credit for the Documentary. However, all broadcasting and Intellectual Property rights of the Documentary shall, to the fullest extent

4

        permitted by law, belong to, vest in and be the absolute and unencumbered property of Press TV.

b)     Press TV's sole obligation will be to make good faith commercially reasonable efforts to accord credit to the Contractor. However, Press TV and its distributors will reserve the right in the manner of crediting the Contractor.

c)     The Contractor irrevocably grants Press TV the right to use its name and biographical information in credits, advertising, publicity and other materials created by Press TV in connection with the exploitation of Press TV's rights hereunder. However, Press TV will not unreasonably hold permission for the Contractor to have its name associated with the Documentary.

d)     Neither the Contractor nor any contributor shall publicise the Documentary at any film festival, public screening, award ceremony or any other platform without the prior written authorisation of Press TV.

e)     The Contractor warrants to Press TV that none of the audio or visual content in the Documentary infringes any third party rights and that the Final Production is cleared of all third party intellectual property rights.

f)     The Contractor accepts absolute liability for any third party claims in respect of any infringement in the Final Production of any third party rights.

5.     **Archive Access**

a)     Provided that the Contractor is not in breach of this Agreement, Press TV in its sole discretion may provide the Contractor with access to the Archive solely for use in the Final Production and subject to any restrictions imposed by Press TV.

b)     The Contractor's use or access to the Archive shall be strictly limited in accordance with all of the conditions specified by Press TV.

c)     The Contractor hereby warrants and represents that the Contractor shall only use the Archive as outlined in this Agreement. The Contractor hereby acknowledges and understands that any of the Contractor's use of the Archive for any purpose, except as outlined herein, shall constitute an intentional breach of this Agreement and a violation of law, for which Press TV shall be entitled to any and all remedies at law and equity applicable to such violations including, without limitation, immediate termination of this Agreement, injunctive relief and damages.

d)     The Contractor hereby indemnifies Press TV against any third party claims brought against Press TV in connection with the Contractor's breach or all alleged breach of the warranties and representations set forth herein.

6.     **Assignment**

a)  This Agreement and the Contractor's rights and obligations hereunder will be non-assignable and non-delegable by the Contractor except as approved by Press TV in writing.

b)  Press TV will have the right to assign this Agreement and its rights and obligations hereunder at any time, in whole or in part, to any party. If such party assumes in writing the obligations of Press TV hereunder (or any of them), Press TV will be released and discharged from the obligations so assumed.

7.  **Law and Jurisdiction**

Any dispute in the meaning, effect or validity of this Agreement will be resolved in accordance with the Iranian laws without regard to the conflict of law's provisions thereof.

8.  **Notice**

a)  All notices in connection with this Agreement will be given in writing, addressed to each party as indicated in the introductory portion of the Agreement (with notices to Press TV directed to its Production Manager, with a copy to its Chief Executive), by deposit, postage prepaid or by email or by fax and will be deemed given three working days after the date of mailing, if so mailed, or on the date transmitted, if transmitted via email or fax.

b)  If the date on which notice is due falls on a Thursday, Friday or holiday or another day on which Press TV is not open for business, then the date for giving such notice will be automatically extended to the next, regular business day. The parties may change their respective notice address by giving the other party written notice of the new address.

9.  **Termination**

a)  If either party is in breach of any of its obligations under this Agreement, the non-defaulting party may serve notice of the breach to the defaulting party, upon which the defaulting party shall have thirty calendar days within which to remedy the breach; the failure of which shall give the non-defaulting party the right to terminate this Agreement without notice.

b)  Notwithstanding the foregoing, Press TV may terminate this Agreement upon providing thirty calendar days' notice to the Contractor, for any reason and with or without cause, and its sole obligation upon termination is to pay a pro-rated payment up to the date of termination in accordance with the relevant provisions of Clause 3 of this Agreement and shall be calculated according to an agreed progress of work.

c)  The Contractor may only terminate this contract for Press TV's material breach following notice and a reasonable opportunity to remedy. In such event, all rights granted and all materials created will be vested in Press TV and Press TV's sole obligation upon termination is to pay any then vested, pro-rated Payment. The



Contractor maintains the right to be associated with the Documentary and only has the right to use the material with consent from Press TV.

## 10. Miscellaneous

a) In any action or proceeding to enforce rights under this Agreement, the prevailing party shall be entitled to recover reasonable costs and legal fees.

b) If any provision of this Agreement is held to be illegal or unenforceable, that provision will be limited or eliminated to the minimum extent necessary so that this Agreement will otherwise remain in full force and effect and enforceable so as to give effect to the intent of the parties hereunder.

c) Nothing herein contained will constitute a partnership between, or joint venture of, the parties hereto or constitute either party the agent of the other.

d) Press TV shall not provide the Contractor with any resources, equipment, archive footage or music, staff, editors, graphics, phone-lines, internet access, rooms, cameras or production insurance.

e) This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and can only be modified or amended by one or more mutually signed schedule or schedules.

**Signature on behalf of Press TV**

Dated: 03 June 2012

Name of signatory: Amir Tajik
Position: Director, Documentary Department

**Signature on behalf of** ............ (The Contractor)

Dated: 03/06/2012

Name of signatory: NADER MOKHTARI
Position: PRODUCER/DIRECTOR

7